IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 23-cr-00300-CNS-4

UNITED STATES OF AMERICA,

    Plaintiff,

v.

4. OREOLUWA ABDUL-JABBAR ELEGBA,

    Defendant.

## PLEA AGREEMENT AND STATEMENT OF FACTS RELEVANT TO SENTENCING

The United States of America, by and through Craig G. Fansler, Assistant United States Attorney for the United States Attorney's Office for the District of Colorado (the "government"), and the defendant, Oreoluwa Abdul-Jabbar Elegba ("Elegba" or the "defendant"), personally and by counsel, Thomas Goodreid, submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1. This agreement binds only the Criminal Division of the United States Attorney's Office for the District of Colorado and the defendant.

## I. AGREEMENT

**A.    Defendant's Plea of Guilty:**

The defendant agrees:

(1)    to plead guilty to count 2 of the Indictment charging a violation of 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering);

(2)    to waive certain appellate and collateral attack rights, as explained in

COURT
EXHIBIT
1

detail below;

(3)    to pay restitution to the victims of this offense in an amount to be determined at sentencing. In advance of the sentencing hearing, the parties intend to confer and endeavor to reach an agreement as to the amount of restitution;

(4)    not to contest forfeiture, as more fully described below.

## B.    The Government's Obligations:

This agreement is made pursuant to Fed.R.Crim.P.11(c)(1)(A). The government agrees not to bring other charges against the defendant based on information currently known to the United States Attorney's Office, District of Colorado concerning the money laundering conspiracy described below. Should the plea of guilty be vacated on the motion of the defendant, the government may, in its sole discretion, file a superseding indictment.

Provided the defendant does not engage in prohibited conduct or otherwise implicate U.S.S.G. §§ 3C1.1 and 3E1.1, cmt. n.4 between the guilty plea and sentencing in this case, the government agrees that the defendant should receive a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) and agrees to file a motion requesting that the defendant receive a one-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(b). The government agrees to recommend a term of imprisonment not greater than the low-end of the applicable guideline range calculated by the court at sentencing.

## C.    Defendant's Waiver of Appeal:

The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined. Understanding

2

this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence (including the restitution order), unless it meets one of the following criteria:

(1)    the sentence exceeds the maximum sentence provided in the statute of conviction, 18 U.S.C. § 1956;

(2)    the sentence exceeds the top end of the advisory guideline range from the Sentencing Guidelines that applies for the defendant's criminal history (as determined by the district court) at a total offense level of **23**; or

(3)    the government appeals the sentence imposed.

If the first criterion applies, the defendant may appeal only the issue of how his sentence exceeds the statutory maximum sentence. But if one of the latter two criteria apply, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence (including the restitution order) in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255). This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds:

(1)    the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute;

(2)    the defendant was deprived of the effective assistance of counsel; or

(3)    the defendant was prejudiced by prosecutorial misconduct.

The defendant also waives the right to appeal any sentence imposed below or

within the Guideline range upon a revocation of supervised release in this case number, except where the defendant unsuccessfully objects to the grade of violation applied by the court during the district court revocation proceedings. In that event, this waiver does not apply and the defendant may appeal the sentence imposed upon a revocation of supervised release, even if that sentence falls below or within the guideline range calculated by the court.

The defendant also waives the right to appeal the denial of any motion filed under 18 U.S.C. § 3582(c)(1)(A) where such denial rests in any part upon the court's determination that a sentence reduction is not warranted under the factors set forth in 18 U.S.C. § 3553(a). This waiver does not apply to an appeal of a denied § 3582(c)(1)(A)(i) motion where the district court, in denying the motion on § 3553(a) grounds, failed to consider the facts allegedly establishing extraordinary and compelling circumstances as part of its § 3553(a) analysis.

### D.    Forfeiture of Assets:

The defendant admits the forfeiture allegations. The defendant further agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 982(a)(1) whether in the possession or control of the United States, the defendant, the defendant's nominees, or elsewhere. The assets to be forfeited specifically include but are not limited to a money judgment in the amount of the proceeds obtained by the conspiracy. The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, and/or administrative forfeiture action. The

4

defendant understands that pursuant to 18 U.S.C. § 983, the seizing agency is required to send notice in non-judicial civil forfeiture matters. Having been advised of said rights regarding notice, the defendant hereby knowingly and voluntarily waives his rights to notice being sent within the time frames in 18 U.S.C. § 983 and to having the property returned to him if notice is not sent within the prescribed time frames. The defendant further agrees to the forfeiture of any substitute assets up to the value of any property described above pursuant to 21 U.S.C. § 853(p) and Federal Rules of Criminal Procedure 32.2(e).

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to forfeiture.

The United States Attorney's Office for the District of Colorado will recommend to the Attorney General that any net proceeds derived from the sale of the judicially forfeited assets be remitted or restored to eligible victims of the offense, for which the defendant has pleaded guilty, pursuant to 18 U.S.C. § 981(e), 28 C.F.R. pt. 9, and any other applicable laws, if the legal requirements for recommendation are met and to relay any such payments made to victims through remission or restoration to the Clerk of Court to be offset against restitution. The defendant understands that the United States Attorney's Office only has authority to recommend such relief and that the final decision of whether to grant relief rests solely with the Department of Justice, which will make its decision in accordance with applicable law.

## II. ELEMENTS OF THE OFFENSE

### A.    Count 2 (Money Laundering Conspiracy)

The parties agree that the elements of Count 2, a violation of 18 U.S.C. § 1956(h), Money Laundering Conspiracy, are as follows:

1.    the defendant agreed with at least one other person to commit money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i) (Promotion) and 18 U.S.C. §1956(a)(1)(B)(i) (Concealment);

2.    the defendant knew the essential objectives of the conspiracy;

3.    the defendant knowingly and voluntarily participated in the conspiracy; and

4.    there was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged.

Tenth Circuit Pattern Jury Instructions for Conspiracy, § 2.19 (2021) (modified) (no 10th Circuit Pattern Instruction); *see* 18 U.S.C. § 1956(h); *United States v. Keck*, 643 F.3d 789, 794 (10th Cir. 2011); *United States v. Fishman*, 645 F.3d 1175, 1187 (10th Cir. 2011); *Whitfield v. United States*, 543 U.S. 209, 215-216 (2005) (there is no overt act requirement for a 1956(h) conspiracy).

The parties agree that the elements of the first object of the conspiracy, Money Laundering (Concealing Illegal Proceeds), a violation of 18 U.S.C. § 1956(a)(1)(B)(i), are as follows:

1.    the defendant conducted a financial transaction;

2.    the transaction involved the proceeds of wire fraud;

3.    the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity; and

4.    the defendant conducted the financial transaction knowing it was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of unlawful activity.

*See* 10th Cir. Crim. J.I. § 2.73.1, *United States v. Gonzalez*, 918 F.3d 808, 812 (10th Cir. 2019).

The parties agree that the elements of the second object of the conspiracy, Money Laundering (Promotion), a violation of 18 U.S.C. § 1956(a)(1)(A)(i), are as follows:

6

1. the defendant conducted or attempted to conduct a financial transaction;

2. the transaction involved the proceeds of wire fraud;

3. the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity; and

4. the defendant conducted the financial transaction with the intent to promote the carrying on of wire fraud.

*See* 10th Cir. Crim. J.I. § 2.73, *United States v. Johnson*, 821 F.3d 1194, 1203 (10th Cir. 2016).

## III. STATUTORY MAXIMUM SENTENCE

The maximum sentence for a violation of Count 2 of the Indictment is: not more than 20 years' imprisonment; maximum fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or both fine and imprisonment; not more than three years of supervised release; $100 mandatory victim's fund assessment fee; and restitution in an amount to be determined at the time of sentencing.

## IV. COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including, but not limited to, the rights to possess firearms, vote, hold elected office, and sit on a jury. The conviction may cause the defendant to be deported and removed from the United States, or confined indefinitely if there is no country to which the defendant may be deported, denied future admission into the United States, and/or to be denied citizenship.

## V. STIPULATION OF FACTS

The factual basis for this plea is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from presenting non-contradictory additional facts which are relevant to the Court's guideline computation, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties stipulate that the following facts are true and correct.

### A. Background on Relevant Federal Programs

Between March 2020 and at least April 2021, Congress authorized emergency financial assistance to millions of Americans suffering adverse economic effects caused by the COVID-19 pandemic, including through the Economic Injury Disaster and Paycheck Protection Programs (EIDL and PPP, respectively) administered by the Small Business Administration (SBA) and by providing funding to extend and expand state unemployment insurance (UI) benefit programs. The Internal Revenue Service (IRS) paid refunds to taxpayers whose federal income tax withheld for the year exceeds the total tax they owe. During the COVID-19 pandemic, the Department of Treasury and IRS also provided Economic Impact Payments, also referred to as tax

stimulus payments, based on information provided on the previous year's tax return and deposited these payments in the same bank account that received the previous year's refund.

## B.    Summary of the Fraud Ring

Between March 2020 and July 2022, Ikponmwosa Erhinmwinrose and co-conspirators ("Fraud Ring") obtained more than $8,119,037 from government programs ("Wire Fraud Proceeds") by using information of identity theft victims to submit (1) fraudulent applications under the Paycheck Protection Program (PPP), Economic Injury Disaster Loan (EIDL) program, and state unemployment insurance (UI) benefit programs, and (2) fraudulent tax returns to obtain tax refunds and Economic Impact payments. Fraud proceeds included:

| Program | Begin and End Dates | Loss Amount | Victim |
|---|---|---|---|
| EIDL | April 2020 – Sept. 2020 | $2,332,600 | SBA |
| PPP | Feb. 2021 – June 2021 | $ 5,704,967 | Various Lenders |
| UI | At least 2020-2021 | $422,047 | States including CO, IL, KS, NJ, NY, OH, WA |
| Tax Refunds | April 2020-July 2022 | $81,470 | IRS |
| **Total** | **April 2020-July 2022** | **$8,541,084** | |

## C.    Summary of the Money Laundering Conspiracy

Upon receipt of the Wire Fraud Proceeds, Elegba, along with his co-defendants Erhinmwinrose, Nyerhovwo Agbure, Victor Tobore, and other co-conspirators coordinated monetary transactions with the objectives to conceal and disguise the

9

nature, location, source, ownership, and control of Wire Fraud Proceeds and to promote the carrying on of wire fraud.

### D.    Elegba's Role in the Conspiracy

Elegba's role was limited to the money laundering conspiracy: he was one of multiple "soldiers" or "runners" whose role in the scheme was to convert the Wire Fraud Proceeds from bank accounts in other names that received the proceeds to cash and money orders that could be distributed among the co-conspirators, without the intermediate transactions being directly traceable to the Fraud Ring organizers. Erhinmwinrose and Agbure—who were referred to as "Chairman" and "CEO," respectively—coordinated the runners, including the two runners charged in this prosecution: Elegba and Tobore.

### 1.    Concealment money laundering through Green Dot bank accounts

One method utilized was for Erhinmwinrose and other conspirators to open Green Dot bank accounts under various names of identity theft victims including B.J., K.T., M.P., P.S., R.W., and S.R. and request disbursement of Wire Fraud Proceeds to these bank accounts and associated debit cards.

Initially, Erhinmwinrose and other conspirators directed Elegba and other runners to visit retail stores such as Walmart to purchase debit cards. Elegba then sent the debit card information to Erhinmwinrose and Agbure using messaging applications such as WhatsApp so that the bank accounts could be registered online in other names before Erhinmwinrose and other conspirators listed the accounts on fraudulent applications to receive fraud proceeds.

At the time Erhinmwinrose and other conspirators registered the debit cards, they listed Elegba's address as the address of record for mailing debit cards and other bank communications.

After funds were deposited to the debit cards, Elegba—at the direction of Erhinmwinrose and other conspirators—used the debit cards to purchase blank money orders from multiple retail stores and withdrew cash from banks or ATMs in close geographic proximity over a short time frame, typically for amounts at or below $3,000.

After obtaining cash or blank money orders, Elegba then transferred the funds to Erhinmwinrose, Agbure, and other conspirators. Elegba received a commission of approximately five percent of the proceeds he laundered, as determined by Erhinmwinrose and Agbure.

2.  *Erhinmwinrose provides information to Elegba to set up bank accounts used to launder funds*

Another method was for Erhinmwinrose to provide identity theft victims' information to Elegba for Elegba to establish corporate bank accounts in these names to facilitate the laundering of proceeds, without transactions being directly traceable to Erhinmwinrose.[1]

As initial steps, Erhinmwinrose obtained fabricated identity documents such as drivers' licenses and fraudulently obtained corporate registrations and tax

---

[1] Many of these accounts were established using synthetic identities, which means they used a combination of real information—such as real social security numbers—with other false information so that the resulting identity is not associated with a real person. In these circumstances, names rather than initials are used.

11

identification numbers by making false statements to state governments and the Internal Revenue Service. He then provided fabricated and fraudulent documents to runners including Elegba so they could establish bank accounts under synthetic identities including the name Anthony Reed. At the direction of Erhinmwinrose, Elegba established an account in the name of Anthony Reed as owner of the fictitious corporate entity AR Logistics.

More specifically, Erhinmwinrose saved a draft email on August 11, 2020 with the title "New ore" containing PII for Anthony Reed and corporate registration information for AR Logistics. "Ore" is the first three letters of Elegba's first name and was a nickname used for him by Erhinmwinrose and other conspirators. Erhinmwinrose provided Elegba with a fake driver's license bearing the name of Reed but Elegba's picture, as well as corporate registration documents fraudulently obtained from the state of Indiana. Elegba traveled to Indiana on August 12, 2020 to open a bank account under the AR Logistics name.

3.    *Use of fraudulently obtained bank accounts by Elegba, Agbure, and Tobore to coordinate laundering of funds*

On September 18, 2020, Elegba texted the bank account information for AR Logistics to Tobore so that Tobore could deposit Wire Fraud Proceeds into the Elegba-controlled AR Logistics bank account. Following this text, Tobore deposited $71,200.47 into the Elegba-controlled account over three deposits and confirmed each deposit by text message:







On September 18, 2020, Tobore deposited a $30,000 check; on September 23 and 25, 2020, Tobore made bulk deposits of money orders that had been purchased with Wire Fraud Proceeds. Tobore saved a notes file on his phone to record these three deposits and to track other monetary transactions he handled.

### 4.    Elegba, Agbure, and Tobore coordinate additional layer of transactions for larger PPP loans

After conspirators began obtaining EIDL and PPP loans for larger amounts, Agbure provided business checks from bank accounts he controlled—including an account using the synthetic identity of Laurence Iyapo—for deposit into accounts

Elegba, Tobore, and Conspirator 2 controlled using other names. As one example, after an EIDL was obtained in the name of identity theft victim W.L. in August 2020 in the amount of $85,400, the loan proceeds were wired to the Iyapo account. Agbure transmitted these proceeds from the Iyapo bank account to other conspirators by writing checks to corporate entities, including a check to AR Logistics for $15,000 on August 20, 2020. After this check was deposited into the account Elegba controlled, Elegba visited local banks multiple times over a short time period to withdraw amounts at or below $3,000 from ATMs and amounts below $10,000 from bank tellers. Elegba subsequently gave the cash he obtained at the direction of Agbure to Agbure.

As another example, after a PPP loan was obtained in the name of identity theft victim L.R. in February 2021 for the amount of $451,925, the loan proceeds were wired to the Iyapo account. Agbure transmitted these proceeds to other conspirators via checks to corporate entities from the Iyapo bank account, including a check to AR Logistics for $8,750 on March 1, 2021. After this check was deposited into the account Elegba controlled, Elegba visited local banks multiple times over a short time period to withdraw amounts at or below $3,000 from ATMs. Elegba subsequently gave the cash he obtained at the direction of Agbure to Agbure.

Evidence obtained during the investigation indicates that money runners in Elegba's position received approximately five percent of the funds they each laundered as payment.

In conducting these transactions, Elegba knew they were designed to conceal the nature, location, source, ownership, and control of Wire Fraud Proceeds.

14

5.    *Delivery of money to Agbure and Erhinmwinrose*

During the term of the conspiracy, on multiple occasions, Elegba—after moving Wire Fraud Proceeds through various accounts and converting Wire Fraud Proceeds to cash—delivered cash to Agbure and Erhinmwinrose, including at Erhinmwinrose's automobile business, IGI Autos, and by depositing cash to corporate bank accounts linked to Agbure's businesses.

6.    *Elegba used Wire Fraud Proceeds to promote further criminal activity*

Elegba also received instructions from Agbure and Erhinmwinrose to use Wire Fraud Proceeds to promote the criminal conspiracy. For example, on multiple occasions, Elegba was provided with Wire Fraud Proceeds and instructed to purchase debit cards at retail locations including Walmart. When purchasing these debit cards, a small initial deposit, which was often around $20, was made to establish a Green Dot bank account linked to the debit card. Elegba then transmitted the card information to Erhimwinrose and other conspirators on messaging applications including WhatsApp. After this transmittal, Erhinmwinrose and other conspirators registered the bank accounts using the information of identity-theft victims and then used the bank account and routing number associated with the cards to submit additional fraud applications for government benefits including EIDLs and UI benefits and on tax returns.

In conducting these transactions, Elegba's intent was that the purchases of debit cards would promote the carrying on of additional wire fraud that would result in additional Wire Fraud Proceeds and resulting commissions to Elegba.

E.    **Knowledge of Unlawful Activity**

At all relevant times, Elegba knew that the Wire Fraud Proceeds came from unlawful activity. Specifically, he knew that the Wire Fraud Proceeds came from illegal activity, which he initially understood to include romance fraud schemes. Eventually, Elegba learned that Wire Fraud Proceeds also came from submission of fraudulent applications for government benefits. Elegba's participation in the conspiracy occurred for approximately fourteen months, from approximately April 2020 until approximately June 2021.

F.    **Value of Laundered Funds and Restitution**

The government submits that, for purposes of § 2S1.1, the proper calculation of the value of laundered funds known at this time to be involved in the charged money laundering conspiracy is $4,084,689.22, which includes (a) Wire Fraud Proceeds obtained through tax refunds, tax stimulus payments, and the PPP, EIDL, and state UI programs, (b) that also were involved in laundering transactions by members of the conspiracy within the meaning of § 2S1.1 app. note 1:

| Program | Value of laundered funds involved in transactions |
|---|---|
| PPP | $2,494,075 |
| EIDL | $1,095,000 |
| UI benefits (includes UI payments from CO, IL, IA, KS, NY, and RI) | $422,047 |
| Tax refund | $73,567.22 |
| Total | $4,084,689.22 |

During Elegba's involvement in the conspiracy, he used shell corporations set up for the purpose of laundering funds and engaged in two or more levels of laundering transactions, including purchasing money orders, withdrawing cash,

16

transporting cash, and depositing cash to bank accounts tied to other conspirators and other shell corporations.

## VI.  ADVISORY GUIDELINE COMPUTATION

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

The Guideline calculation below is the good-faith estimate of the parties, but it is only an estimate. The parties understand that the government also has an independent obligation to assist the Court in making an accurate determination of the correct guideline range. To that end, the parties may argue that facts identified in the presentence report, or otherwise identified during the sentencing process, affect the estimate below.

A.    The parties agree that the applicable guideline is §2S1.1(a)(2) and that under §2S1.1(a)(2), the base offense level is 8 plus the number of the offense levels from the table in §2B1.1 corresponding to the value of the laundered funds. The government submits that there is an 18-level increase based on a value of laundered funds of more than $3,500,000, but less than $9,500,000, which would make the base offense level 26. The defendant reserves the right to contest this Guideline calculation, based upon the proper application of "relevant- conduct" to his offense conduct.

17

B.      The defendant should receive a 2-level increase because he is pleading guilty under 18 U.S.C. § 1956. § 2S1.1(b)(2)(B).

C.      The defendant should receive a 2-level increase because the offense involved sophisticated laundering. § 2S1.1(b)(3).[2]

D.      The government submits that the defendant should receive a 2-level reduction for minor role in the offense, because the loss amount greatly exceeds the defendant's personal gain from the offense and the defendant received direction from others above him in the conspiracy. § 3B1.2 app. note 3(A). The defendant reserves the right to argue that he should receive a 3-level reduction for role in the offense.

E.      The defendant should qualify for a 2-level reduction applicable to certain zero-point offenders who meet designated criteria. § 4C1.1.

F.      There are no victim-related adjustments, obstruction, grouping, and/or multiple-count adjustments.

G.      The defendant should receive a 3-level reduction for acceptance of responsibility. § 3E1.1(b).

H.      The adjusted offense level for Count 2 based on the government's calculation is 23.

I.      The parties understand that the defendant's criminal history computation is tentative. The criminal history category is determined by the Court based on the defendant's prior convictions. Based on information currently available to the parties, it is estimated that the defendant's criminal history category would be I.

J.      The career offender/criminal livelihood/armed career criminal adjustments would not apply.

K.      The advisory guideline range resulting from these calculations is 46-57 months. However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the offense level(s) estimated above could conceivably result in a range from 46 months (bottom of Category I) to 115 months (top of Category VI). The guideline range would not exceed, in any case, the statutory maximum applicable to the count of conviction.

---

[2] Although some factors relevant to the enhancement for the business of laundering funds are satisfied, *see* § 2S1.1(b)(2)(B), the application of that enhancement instead of sophisticated laundering would result in the same offense level.

L.      Pursuant to guideline § 5E1.2, assuming the estimated offense level above, the fine range for this offense would be $20,000 to $200,000, plus applicable interest and penalties.

M.     Pursuant to guideline § 5D1.2, if the Court imposes a term of supervised release, that term is at least 1 year, but not more than 3 years.

N.     Pursuant to guideline §5E1.1(a)(1), the Court shall enter a restitution order for the full amount of the victims' losses.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII. ENTIRE AGREEMENT

The agreement disclosed to the Court is the entire agreement. There are no other promises, agreements or "side agreements," terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any other terms, promises, conditions or assurances.

05/20/2024
Date

OREOLUWA ABDUL-JABBAR ELEGBA
Defendant

5/28/2024
Date

*Thomas C. Goodreid*
THOMAS GOODREID
Attorney for Defendant

07/10/2024
Date

CRAIG G. FANSLER
Assistant U.S. Attorney

20