# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Criminal Case No. 23-cr-00300-CNS-3

UNITED STATES OF AMERICA,

       Plaintiff,

v.

3. NYERHOVWO PRESLEY AGBURE,

       Defendant.

---

## PLEA AGREEMENT AND STATEMENT OF FACTS
## RELEVANT TO SENTENCING

---

The United States of America, by and through Craig G. Fansler, Assistant United States Attorney for the United States Attorney's Office for the District of Colorado (the "government"), and the defendant, NYERHOVWO PRESLEY AGBURE ("Agbure " or the "defendant"), personally and by counsel, Josh Amos, submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1. This agreement binds only the Criminal Division of the United States Attorney's Office for the District of Colorado and the defendant.

## I.  AGREEMENT

**A.    Defendant's Plea of Guilty:**

The defendant agrees:

    (1)    to plead guilty to count 2 of the Indictment charging a violation of 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering);

    (2)    to waive certain appellate and collateral attack rights, as explained in



**COURT EXHIBIT**

detail below;

(3)     to pay restitution to the victims of this offense in an amount to be determined at sentencing, to include at least $644,300 in restitution to the SBA plus interest accruing through the date of sentencing. In advance of the sentencing hearing, the parties intend to confer and endeavor to reach an agreement as to the amount of restitution;

(4)     not to contest forfeiture, as more fully described below.

**B.     The Government's Obligations:**

This agreement is made pursuant to Fed.R.Crim.P.11(c)(1)(A). The government agrees not to bring other charges against the defendant based on information currently known to the United States Attorney's Office, District of Colorado. Should the plea of guilty be vacated on the motion of the defendant, the government may, in its sole discretion, file a superseding indictment.

Provided the defendant does not engage in prohibited conduct or otherwise implicate U.S.S.G. §§ 3C1.1 and 3E1.1, cmt. n.4 between the guilty plea and sentencing in this case, the government agrees that the defendant should receive a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) and agrees to file a motion requesting that the defendant receive a one-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(b). The government agrees to recommend a term of imprisonment not greater than the low-end of the applicable guideline range for an offense level of 28 and the criminal history category as calculated by the court at sentencing.

**C.     Defendant's Waiver of Appeal:**

The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the

2

sentence, including the manner in which that sentence is determined. Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence (including the restitution order), unless it meets one of the following criteria:

(1)    the sentence exceeds the maximum sentence provided in the statute of conviction, 18 U.S.C. § 1956;

(2)    the sentence exceeds the top end of the advisory guideline range from the Sentencing Guidelines that applies for the defendant's criminal history (as determined by the district court) at a total offense level of 28; or

(3)    the government appeals the sentence imposed.

If the first criterion applies, the defendant may appeal only the issue of how his sentence exceeds the statutory maximum sentence. But if one of the latter two criteria apply, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence (including the restitution order) in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255). This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds:

(1)    the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute;

(2)    the defendant was deprived of the effective assistance of counsel; or

(3)    the defendant was prejudiced by prosecutorial misconduct.

3

The defendant also waives the right to appeal any sentence imposed below or within the Guideline range upon a revocation of supervised release in this case number, except where the defendant unsuccessfully objects to the grade of violation applied by the court during the district court revocation proceedings. In that event, this waiver does not apply and the defendant may appeal the sentence imposed upon a revocation of supervised release, even if that sentence falls below or within the guideline range calculated by the court.

The defendant also waives the right to appeal the denial of any motion filed under 18 U.S.C. § 3582(c)(1)(A) where such denial rests in any part upon the court's determination that a sentence reduction is not warranted under the factors set forth in 18 U.S.C. § 3553(a). This waiver does not apply to an appeal of a denied § 3582(c)(1)(A)(i) motion where the district court, in denying the motion on § 3553(a) grounds, failed to consider the facts allegedly establishing extraordinary and compelling circumstances as part of its § 3553(a) analysis.

## D.    Forfeiture of Assets:

The defendant admits the forfeiture allegations. The defendant further agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 982(a)(1) whether in the possession or control of the United States, the defendant, the defendant's nominees, or elsewhere. The assets to be forfeited specifically include but are not limited to a money judgment in the amount of the proceeds obtained by the conspiracy. The defendant agrees and consents to the forfeiture of these assets

4

pursuant to any federal criminal, civil, and/or administrative forfeiture action. The defendant understands that pursuant to 18 U.S.C. § 983, the seizing agency is required to send notice in non-judicial civil forfeiture matters. Having been advised of said rights regarding notice, the defendant hereby knowingly and voluntarily waives his rights to notice being sent within the time frames in 18 U.S.C. § 983 and to having the property returned to him if notice is not sent within the prescribed time frames. The defendant further agrees to the forfeiture of any substitute assets up to the value of any property described above pursuant to 21 U.S.C. § 853(p) and Federal Rules of Criminal Procedure 32.2(e).

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to forfeiture.

The United States Attorney's Office for the District of Colorado will recommend to the Attorney General that any net proceeds derived from the sale of the judicially forfeited assets be remitted or restored to eligible victims of the offense, for which the defendant has pleaded guilty, pursuant to 18 U.S.C. § 981(e), 28 C.F.R. pt. 9, and any other applicable laws, if the legal requirements for recommendation are met and to relay any such payments made to victims through remission or restoration to the Clerk of Court to be offset against restitution. The defendant understands that the United States Attorney's Office only has authority to recommend such relief and that the final decision of whether to grant relief rests solely with the Department of Justice, which will make its decision in accordance with applicable law.

## II. ELEMENTS OF THE OFFENSE

### A.    Count 2 (Money Laundering Conspiracy)

The parties agree that the elements of Count 2, a violation of 18 U.S.C. § 1956(h), Money Laundering Conspiracy, are as follows:

1.    the defendant agreed with at least one other person to commit money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i) (Promotion) and 18 U.S.C. §1956(a)(1)(B)(i) (Concealment);

2.    the defendant knew the essential objectives of the conspiracy;

3.    the defendant knowingly and voluntarily participated in the conspiracy; and

4.    there was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged.

Tenth Circuit Pattern Jury Instructions for Conspiracy, § 2.19 (2021) (modified) (no 10th Circuit Pattern Instruction); *see* 18 U.S.C. § 1956(h); *United States v. Keck*, 643 F.3d 789, 794 (10th Cir. 2011); *United States v. Fishman*, 645 F.3d 1175, 1187 (10th Cir. 2011); *Whitfield v. United States*, 543 U.S. 209, 215-216 (2005) (there is no overt act requirement for a 1956(h) conspiracy).

The parties agree that the elements of the first object of the conspiracy, Money Laundering (Concealing Illegal Proceeds), a violation of 18 U.S.C. § 1956(a)(1)(B)(i), are as follows:

1.    the defendant conducted a financial transaction;

2.    the transaction involved the proceeds of wire fraud;

3.    the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity; and

4.    the defendant conducted the financial transaction knowing it was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of unlawful activity.

*See* 10th Cir. Crim. J.I. § 2.73.1, *United States v. Gonzalez*, 918 F.3d 808, 812 (10th Cir. 2019).

The parties agree that the elements of the second object of the conspiracy, Money

6

Laundering (Promotion), a violation of 18 U.S.C. § 1956(a)(1)(A)(i), are as follows:

1.  the defendant conducted or attempted to conduct a financial transaction;

2.  the transaction involved the proceeds of wire fraud;

3.  the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity; and

4.  the defendant conducted the financial transaction with the intent to promote the carrying on of wire fraud.

*See* 10th Cir. Crim. J.I. § 2.73, *United States v. Johnson*, 821 F.3d 1194, 1203 (10th Cir. 2016).

## III. STATUTORY MAXIMUM SENTENCE

The maximum sentence for a violation of Count 2 of the Indictment is: not more than 20 years' imprisonment; maximum fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or both fine and imprisonment; not more than three years of supervised release; $100 mandatory victim's fund assessment fee; and restitution in an amount to be determined at the time of sentencing.

## IV. COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including, but not limited to, the rights to possess firearms, vote, hold elected office, and sit on a jury. The conviction may cause the defendant to be deported and removed from the United States, or confined indefinitely if there is no country to which the defendant may be deported, denied future admission into the United States, and/or to be denied citizenship.

## V. STIPULATION OF FACTS

The factual basis for this plea is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from presenting non-contradictory additional facts which are relevant to the Court's guideline computation, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties stipulate that the following facts are true and correct.

## A.    Background on Relevant Federal Programs

Between March 2020 and at least April 2021, Congress authorized emergency financial assistance to millions of Americans suffering adverse economic effects caused by the COVID-19 pandemic, including through the Economic Injury Disaster and Paycheck Protection Programs (EIDL and PPP, respectively) administered by the Small Business Administration (SBA) and by providing funding to extend and expand state unemployment insurance (UI) benefit programs. The Internal Revenue Service (IRS) paid refunds to taxpayers whose federal income tax withheld for the year exceeded the total tax they owe. During the COVID-19 pandemic, the Department of Treasury and IRS also provided Economic Impact Payments, also referred to as tax stimulus payments, based on information provided on the previous year's tax return

and deposited these payments in the same bank account that received the previous year's refund.

## B.    Summary of the Fraud Ring

Between March 2020 and July 2022, Ikponmwosa Erhinmwinrose and co-conspirators ("Fraud Ring") obtained more than $8,119,037 from government programs ("Wire Fraud Proceeds") by using information of identity-theft victims to submit (1) fraudulent applications under the Paycheck Protection Program (PPP), Economic Injury Disaster Loan (EIDL) program, and state unemployment insurance (UI) benefit programs, and (2) fraudulent tax returns to obtain tax refunds and Economic Impact payments. Wire Fraud Proceeds included:

| Program | Begin and End Dates | Loss Amount | Victim |
|---|---|---|---|
| EIDL | April 2020 – Sept. 2020 | $2,332,600 | SBA |
| PPP | Feb. 2021 – June 2021 | $ 5,704,967 | Various Lenders |
| UI | At least 2020-2021 | $422,047 | States including CO, IL, KS, NJ, NY, OH, WA |
| Tax Refunds | April 2020-July 2022 | $81,470 | IRS |
| Total | April 2020-July 2022 | $8,541,084 | |

## C.    Summary of the Money Laundering Conspiracy

Upon receipt of the Wire Fraud Proceeds, Agbure, along with his co-defendants Erhinmwinrose, Oreoluwa Elegba, Victor Tobore, and other co-conspirators, conducted and coordinated monetary transactions with the objectives to conceal and disguise the nature, location, source, ownership, and control of Wire Fraud Proceeds and to promote

the carrying on of wire fraud.

**D.    Agbure's Conduct and Role in the Conspiracy**

During the term of the conspiracy, Agbure controlled a bank account in the name of Laurence Iyapo that received Wire Fraud Proceeds and then transferred the funds to other bank accounts managed by co-conspirators who could convert the Wire Fraud Proceeds to cash and money orders, without the intermediate transactions being directly traceable to the Fraud Ring organizers.

*1.    Concealment money laundering through Green Dot bank accounts*

One method utilized was for Erhinmwinrose and other conspirators to open Green Dot bank accounts under various names of identity theft victims including B.J., K.T., M.P., P.S., R.W., S.R., and W.S. and request disbursement of Wire Fraud Proceeds to these bank accounts and associated debit cards.

Initially, Erhinmwinrose and other conspirators directed money runners including Elegba and Tobore to visit retail stores such as Walmart to purchase debit cards. The money runners then sent the debit card information to Erhinmwinrose using messaging applications such as WhatsApp so that the bank accounts could be registered online in other names before Erhinmwinrose and other conspirators listed the accounts on fraudulent applications to receive fraud proceeds.

At the time Erhinmwinrose and other conspirators registered the debit cards, on some of the debit cards, Agbure's address was listed as the address of record for mailing debit cards and other bank communications.

After funds were deposited to the debit cards, the debit cards were used to

purchase blank money orders from multiple retail stores and the U.S. Postal Service
and to withdrew cash from banks or ATMs in close geographic proximity over a short
time frame, typically for amounts at or below $3,000. For example, after a Green Dot
debit card in the name of identity-theft victim W.S. was registered at Agbure's
address, the SBA disbursed an EIDL for $22,000. Within days, the debit card was
used near Agbure's residence to purchase over $13,000 in money orders from retail
stores and over $7,000 in U.S. Postal Service money orders using the EIDL funds.
Subsequently, those money orders were deposited in bulk deposits of money orders to
bank accounts used by other conspirators, including bank accounts in the name of MH
Trucking and Matthew Howard but controlled by Tobore.

    2.    *Agbure uses bank account in name of Laurence Iyapo to launder $85,400
in EIDL proceeds*

On July 27, 2020 and September 4, 2020, checking accounts using the
synthetic identity[1] of Laurence Iyapo were opened at Wells Fargo bank. Agbure
used these bank accounts in Iyapo's name.

On August 3, 2020, the SBA transferred $85,400 to one of the Iyapo accounts
for an EIDL intended for identity-theft victim W.L. After these funds were received,
Agbure provided seven business and personal checks from the Iyapo bank account
to false identities or entities associated with Elegba and Tobore:

---

[1] Synthetic identities use a combination of real information—such as real social
security numbers— with other false information so that the resulting identity is not
associated with a real person. In these circumstances, names rather than initials are
used.

| Check # | Check Date | Recipient | Amount |
|---|---|---|---|
| 101 | 8/17/2020 | Matthew Howard | $ 6,500.00 |
| 102 | 8/17/2020 | Matthew Howard | $ 3,210.00 |
| 103 | 8/19/2020 | MH Trucking | $ 15,462.00 |
| 105 | 9/2/2020 | MH Trucking | $ 27,800.00 |
| 109 | 8/19/2020 | MH Trucking | $ 13,400.00 |
| 115 | 8/20/2020 | AR Logistics | $ 15,000.00 |
| 126 | 10/3/2020 | MH Trucking | $ 2,450.00 |
| | | Total | $ 83,822.00 |

The conspirators then laundered the Wire Fraud Proceeds through other bank accounts before returning money to Agbure. As an example, after the $15,000 check was deposited into the AR Logistics account that Elegba controlled, Elegba visited local banks multiple times over a short time period to withdraw amounts at or below $3,000 from ATMs and amounts below $10,000 from bank tellers. Elegba subsequently gave the cash he obtained at the direction of Agbure to Agbure.

3.    *Agbure uses Iyapo bank account to launder PPP proceeds*

After a lender deposited a PPP loan intended for identity-theft victim L.R. in the amount of $451,925 to one of the Iyapo bank accounts in February 2021, the loan proceeds were immediately wired in four transfers to one of the other Iyapo bank accounts.   Agbure then transmitted these proceeds to other conspirators via nine checks endorsed to corporate entities used by Elegba, Tobore, and Conspirator 2 to launder funds:

| Check # | Date | Recipient | Amount |
|---|---|---|---|
| 176 | 2/22/2021 | WC CONSTRUCTION | $ 48,522 |
| 178 | 2/22/2021 | MH TRUCKING | $ 9,850 |
| 151 | 2/23/2021 | INTEL STREET INC. | $ 62,500 |
| 152 | 2/24/2021 | INTEL STREET INC. | $ 62,500 |

| | | | |
|---|---|---|---|
| 177 | 2/26/2021 | MH TRUCKING | $ 8,500 |
| 128 | 3/1/2021 | AR LOGISTICS | $ 8,750 |
| 179 | 3/1/2021 | INTEL STREET INC. | $ 77,500 |
| 180 | 3/1/2021 | INTEL STREET INC. | $ 77,500 |
| 154 | 3/4/2021 | INTEL STREET INC. | $ 95,300 |
| | | **Total** | **$ 450,922** |

In transferring the funds via check to other conspirators to launder, Agbure knew the transactions were designed to conceal the nature, location, source, ownership, and control of Wire Fraud Proceeds.

Similarly, after a lender deposited a PPP loan for $450,157.00 intended for identity-theft victim B.M. to one of the Iyapo bank accounts on April 9, 2021, the entire amount was transferred to one of the other Iyapo bank accounts before three business checks were endorsed to a shell corporation run by Conspirator 2 and laundered through that shell corporation's bank accounts:

| Check # | Date | Recipient | Amount |
|---|---|---|---|
| 138 | 4/12/2021 | INTEL STREET INC. | $ 160,000 |
| 142 | 4/15/2021 | INTEL STREET INC. | $ 170,000 |
| 148 | 4/19/2021 | INTEL STREET INC. | $ 108,000 |
| | | Total | $ 438,000 |

Co-conspirators including Elegba and Tobore took further steps to launder the funds, including visiting local banks multiple times over a short time period to withdraw amounts at or below $3,000 reporting thresholds from ATMs and transferring money overseas. Financial records indicate that Erhinmwinrose and Conspirator 2 were the conspiracy participants who received the largest share of personal gain from the criminal activity.

4.    *Agbure deposits money orders for Tobore to withdraw as cash*

On multiple occasions, Agbure made bulk deposits of money orders purchased with Wire Fraud Proceeds to bank accounts including the MH Trucking account for Tobore to subsequently withdraw as cash. For example, on September 15, Tobore provided the bank account information for MH Trucking to Agbure. The same day, Agbure stated in a message that he deposited $21,000 in previously purchased money orders to this account:

Messages between Agbure ("Odafe," in blue) and Tobore (in green)



September 2020 MH Trucking bank statement

| DATE | DESCRIPTION | | AMOUNT |
|------|-------------|---|--------|
| 09/01 | Deposit | 1106214992 | 56,500.00 |
| 09/04 | Deposit | 1106214811 | 27,800.00 |
| 09/08 | Deposit | 1948115645 | 31,890.00 |
| 09/11 | Deposit | 1108464074 | 33,151.00 |
| 09/15 | Deposit | 1949909831 | 21,000.00 |
| 09/15 | Deposit | 1000005655 | 2,000.00 |
| 09/17 | Deposit | 1950210184 | 25,000.00 |
| 09/22 | Card Purchase Return   0921 Bestbuycom806320967439 Richfield MN Card 8500 | | 142.22 |
| 09/25 | Deposit | 1929638367 | 26,880.28 |
| 09/28 | Deposit | 1948315878 | 10,000.00 |
| **Total Deposits and Additions** | | | **$184,363.50** |

The money orders deposited on September 15 included three $1,000 money orders purchased from a fraudulent EIDL application prepared by Erhinmwinrose for a fake business named Kathryn's Furs, submitted using the information of identity theft victim K.H. Five other money orders were purchased from these same EIDL proceeds and deposited to an individual account in the name of Matthew Howard at a different bank. After the money orders were deposited to the MH Trucking and the Matthew Howard bank accounts, Tobore withdrew the Wire Funds Proceeds as cash from various banks and ATMs over a short time period. Tobore subsequently gave the cash to Agbure or Ehrwinmwinrose, i.e. whoever directed him to obtain and cash the money orders. Tobore received a commission from the proceeds as payment.

5.   *Delivery of money to Agbure and Erhinmwinrose and use of proceeds*

During the term of the conspiracy, conspirators including Elegba and Tobore delivered cash to Agbure and Erhinmwinrose, including by depositing cash to corporate bank accounts linked to Agbure's businesses.

With part of his share of the proceeds, Agbure purchased multiple properties

15

in Nigeria.

     *6.*    *Agbure coordinates use of Wire Fraud Proceeds to promote wire fraud*

Agbure provided instructions to Tobore to use Wire Fraud Proceeds to promote wire fraud. In May 2020, Agbure provided Tobore with corporate bank accounts in Agbure's name to make cash deposits of Wire Fraud Proceeds to make it appear that Agbure's nonoperating businesses were receiving legitimate business revenues (Agbure messages in blue, Tobore in green):





When Tobore responded that there was no PNC Bank locations near Nashville, Agbure provided different accounts and told Tobore how he could deposit the money:



Bank statements then confirm that cash deposits were made across the three

accounts:

| BANK OF AMERICA | | Your checking account |
|---|---|---|

SOHREYN ASSETS HOLDINGS LLC  |  Account # 3340 5774 1670  |  June 1, 2020 to June 30, 2020

**Deposits and other credits**

| Date | Description | | Amount |
|---|---|---|---|
| 06/01/20 | Counter Credit | | 11,380.00 |
| 06/01/20 | Counter Credit | | 10,000.00 |
| 06/19/20 | TD AMERITRADE  DES:ACH MICRO ID:a29PTQCFOS  INDN:AGBURE NYERHOVWO     CO ID:4470533629 PPD | | 0.30 |
| 06/19/20 | TD AMERITRADE  DES:ACH MICRO ID:a29PTQCFOS  INDN:AGBURE NYERHOVWO     CO ID:4470533629 PPD | | 0.25 |
| 06/22/20 | Counter Credit | | 10,000.00 |

In directing Tobore to make cash deposits, Agbure's intent was that the transactions would promote the carrying on of wire fraud.

Specifically, shortly after these deposits, Agbure submitted EIDL applications for two of these same businesses and inflated revenues in those applications. In total, Agbure submitted eight EIDL applications for companies in his own name, wherein he falsely stated that these entities had $3,770,000 in combined revenues and 22 employees. As a result, he obtained $628,300 in EIDLs and $16,000 in related grants (EIDGs):

| Entity Name | Program | Date Submitted (on or about) | Gross Revenues | # of Employees | EIDL Amount | EIDG Amount |
|---|---|---|---|---|---|---|
| Nyerhos Systems | EIDL | 3/31/2020 | $ 1,980,000 | 2 | $ 69,500 | $ 2,000 |
| Nyerhos Freight & Logistics Inc. | EIDL | 5/9/2020 | $ 120,000 | 2 | Not funded | $ - |
| Phonedial LLC | EIDL | 6/16/2020 | $ 200,000 | 2 | $ 80,500 | $ 2,000 |
| Nyerhos Mobile LLC | EIDL | 6/16/2020 | $ 320,000 | 3 | $ 117,000 | $ 3,000 |
| Nyerhos Group Inc. | EIDL | 6/17/2020 | $ 350,000 | 3 | $ 147,000 | $ 3,000 |
| Sohreyn Assets Holdings | EIDL | 6/18/2020 | $ 250,000 | 6 | $ 86,500 | $ 6,000 |
| BBC Capital Investments Inc. | EIDL | 7/27/2020 | $ 275,000 | 2 | Not funded | $ - |
| Nyerhos Truckline LLC | EIDL | 7/27/2020 | $ 275,000 | 2 | $ 127,800 | $ - |
| | | Total | $3,770,000 | 22 | $ 628,300 | $ 16,000 |

## E.    Knowledge of Unlawful Activity

At all relevant times, Agbure knew that the Wire Fraud Proceeds came from unlawful activity. For example, in disbursing Wire Fraud Proceeds from the Iyapo bank account, Agbure knew that the Wire Fraud Proceeds came from illegally

17

obtained EIDLs and PPP loans. Agbure's participation in the conspiracy occurred from approximately March 2020 until approximately June 2021.

## F.    Value of Laundered Funds and Restitution

The government submits that, for purposes of § 2S1.1, the proper calculation of the value of laundered funds known at this time to be involved in the charged money laundering conspiracy is $4,084,689.22, which includes (a) Wire Fraud Proceeds obtained through tax refunds, tax stimulus payments, and the PPP, EIDL, and state UI programs, (b) that also were involved in laundering transactions by members of the conspiracy within the meaning of § 2S1.1 app. note 1:

| Program | Value of laundered funds involved in transactions |
|---|---|
| PPP | $2,494,075 |
| EIDL | $1,095,000 |
| UI benefits (includes UI payments from CO, IL, IA, KS, NY, and RI) | $422,047 |
| Tax refund | $73,567.22 |
| **Total** | **$4,084,689.22** |

During Agbure's involvement in the conspiracy, the conspiracy involved the use of shell corporations to launder funds, and Agbure knew about and participated in two or more levels of laundering transactions, including bulk deposits of money orders, coordinating cash deposits to business accounts, and endorsing checks to shell corporations.

As part of this agreement, in addition to being liable for restitution due for the underlying money laundering conspiracy, in an amount to be determined at sentencing, Agbure understands and agrees to pay restitution on the amount of the unpaid balances on funds he obtained through the EIDL program for EIDLs

submitted in his own name, to be determined at the time of sentencing. Agbure agrees

that the restitution for which he will be held liable for those loans is currently

$644,300, but he understands and agrees that his restitution obligation includes the

interest on the unpaid balance of the EIDLs which will continue to accrue through the

date of sentencing. Interest figures will be presented at the time of sentencing.

## VI.  ADVISORY GUIDELINE COMPUTATION

The parties understand that the imposition of a sentence in this matter is

governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed,

the Court is required to consider seven factors. One of those factors is the sentencing

range computed by the Court under advisory guidelines issued by the United States

Sentencing Commission. In order to aid the Court in this regard, the parties set forth

below their estimate of the advisory guideline range called for by the United States

Sentencing Guidelines. To the extent that the parties disagree about the guideline

computations, the recitation below identifies the matters which are in dispute.

The Guideline calculation below is the good-faith estimate of the parties, but it

is only an estimate. The parties understand that the government also has an

independent obligation to assist the Court in making an accurate determination of the

correct guideline range. To that end, the parties may argue that facts identified in the

presentence report, or otherwise identified during the sentencing process, affect the

estimate below.

    A.    The parties agree that the applicable guideline is §2S1.1(a)(2) and that
under §2S1.1(a)(2), the base offense level is 8 plus the number of the
offense levels from the table in §2B1.1 corresponding to the value of the
laundered funds. The government submits that there is an 18-level

increase based on a value of laundered funds of more than $3,500,000,
but less than $9,500,000, which would make the base offense level 26.
The defendant reserves the right to contest this Guideline calculation,
based upon the proper application of "relevant conduct" to his offense
conduct.

B.   The defendant should receive a 2-level increase because he is pleading
     guilty under 18 U.S.C. § 1956. § 2S1.1(b)(2)(B).

C.   The defendant should receive a 2-level increase because the offense
     involved sophisticated laundering. § 2S1.1(b)(3).[2]

D.   The parties disagree on whether a role adjustment should apply. The
     government submits that the defendant should receive a 3-level increase as
     a manager or supervisor in a criminal activity involving five or more
     participants[3] or that was otherwise extensive. § 3B1.1(b). The defendant
     reserves the right to argue that the defendant should receive a 2-level
     reduction for minor role in the offense, because the loss amount exceeds
     the defendant's personal gain from the offense and the defendant received
     direction from others above him in the conspiracy. § 3B1.2 app. note 3(A).
     Based on the facts known at this time, the parties agrees that, if the
     defendant were to receive a 3-level increase (and no two-level decrease
     for minor role), it would overstate his relative culpability compared to
     other defendants who have pled guilty in this case. The government
     agrees that, in this circumstance, it would recommend at least a two-
     level variance to avoid unwarranted sentencing disparities between other
     defendants in this case. If the Court finds that the three-level role
     adjustment does not apply, the government will determine whether any
     variance is warranted after the filing of the defendant's motion.

E.   If the defendant receives an aggravating role adjustment, the
     government maintains that the defendant would not qualify for a 2-level
     reduction applicable to certain zero-point offenders who meet designated
     criteria. § 4C1.1. The defendant reserves the right to contest this
     adjustment.

F.   There are no victim-related adjustments, obstruction, grouping, and/or
     multiple-count adjustments.

---

[2] Although some factors relevant to the enhancement for the business of laundering
funds are satisfied, see § 2S1.1(b)(2)(B), the application of that enhancement instead
of sophisticated laundering would result in the same offense level.

[3] Among other participants, the conspiracy included the four defendants named in this
indictment and Conspirator 2.

20

G.   The defendant should receive a 3-level reduction for acceptance of responsibility. § 3E1.1(b).

H.   The adjusted offense level for Count 2 would be 28 if an aggravating role adjustment is applied (which reflects the two-level variance), 25 with no role adjustment (and no variance), and 23 if a mitigating role adjustment is applied (with no variance).

I.   The parties understand that the defendant's criminal history computation is tentative. The criminal history category is determined by the Court based on the defendant's prior convictions. Based on information currently available to the parties, it is estimated that the defendant's criminal history category would be I.

J.   The career offender/criminal livelihood/armed career criminal adjustments would not apply.

K.   The advisory guideline range resulting from these calculations ranges from 46-57 months (for offense level of 23) to 78-97 months (for offense level 28). However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the offense level(s) estimated above could conceivably result in a range from 46 months (bottom of Category I for offense level of 23) to 175 months (top of Category VI for offense level of 28). The guideline range would not exceed, in any case, the statutory maximum applicable to the count of conviction.

L.   Pursuant to guideline § 5E1.2, assuming the highest estimated offense level above of 30, the fine range for this offense would be up to $30,000 to $300,000, plus applicable interest and penalties.

M.   Pursuant to guideline § 5D1.2, if the Court imposes a term of supervised release, that term is at least 1 year, but not more than 3 years.

N.   Pursuant to guideline §5E1.1(a)(1), the Court shall enter a restitution order for the full amount of the victims' losses.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including

21

imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII.   ENTIRE AGREEMENT

The agreement disclosed to the Court is the entire agreement. There are no other promises, agreements or "side agreements," terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any other terms, promises, conditions or assurances.

2-18-25
Date

NYERHOVWO PRESLEY AGBURE
Defendant

2-18-25
Date

JOSH AMOS
Attorney for Defendant

2-18-25
Date

CRAIG G. FANSLER
Assistant U.S. Attorney

22